# COUNTY OF WASHINGTON.

———o———

GEORGE HUSTEN ET AL. *versus* JOSEPH RICHARDS.

Where there is a chartering of the whole vessel under and over decks, on the one part, and on the other part an agreement to pay a given sum for the *use of the vessel*, the agreement will be treated as a contract of hiring, rather than of affreightment.

Under such an agreement, the cargo offered must be suited to the capacity of the vessel, and the owner is not bound to alter his vessel to accommodate the freight, and damages may be recovered for the difference between the contract price and what the vessel might have earned by pursuing the voyage with other freight; and for necessary delay.

This case was REPORTED by HATHAWAY, J., and is an action of ASSUMPSIT upon the following contract:

"Agreement made and concluded between Captain Jerome Eaton, Agent for owners of schooner Susan Husten, and Edmund A. Souder & Co., Agents for Joseph Richards, that the party of the first part agrees to the chartering of the whole of said schooner, under and over deck, for a voyage from Bangor, or Mill Creek, to Philadelphia, and the party of the second part agrees to furnish to the said schooner a cargo of spars or other materials, and pay for the use of the vessel four hundred dollars, upon delivery of cargo in Philadelphia.          Signed,          E. A SOUDER & Co.,
Agents for J. RICHARDS & Co.
JEROME EATON, Agent for Owners."

April 15, 1853.

*George W. Dyer*, counsel for the plaintiffs.
The plaintiffs should recover in this action, because

1. The defendant entered into the contract of affreighment with the plaintiffs, by a writing executed by persons compe-

Husten *v.* Richards.

tent to bind these parties, which contract did bind them, and there has been no payment or satisfaction.

It is admitted that the plaintiffs were the owners of the Susan Husten, at the date of the contract, and it is proved that Eaton, one of them, was the master of the vessel, whose authority to act for the owners has been ratified by suit, if any ratification had been necessary, and that E. A. Souder & Co. were the agents of the defendant, duly authorized to act for him in hiring the vessel.

2. The plaintiffs offered to fulfill their part of the contract, and were able, ready and desirous to take the cargo mentioned in the charter, or any other cargo, which the vessel could carry without enlargement of her port-holes.

3. The defendant's agent, having examined the vessel in Philadelphia, as did also the defendant himself, and the charter being for the particular vessel, the defendant was bound to furnish such a cargo for her as she could take in and carry without enlargement of her port-holes, or making any material alteration of her hull. And the plaintiffs were under no obligation to enlarge the port-holes, or to make any alterations in the hull of the vessel, in order that she might take in a particular cargo. *Horill* v. *Stephenson,* 4 Carr and Payne, 469, S. C.; 19 English Common L. R., 605; *Beecher* v. *Becktel,* U. S. Circuit Court, NELSON, J., reported in New York Tribune, September 24, 1853; *Thurston* v. *Foster,* 2 Fairf. R., 74.

4. The plaintiffs were excused from taking any spars, which the defendant said he had, which could not have been taken into the port-holes of the vessel, without enlarging them, or without injury to the vessel.

The defendant having prevented the performance of the contract upon the part of the plaintiffs, shall not take advantage of its non-performance, and the plaintiffs have a right of action for the damage they have sustained through the misconduct of the defendant. *Jones* v. *Barkley,* Douglass R., 694; *Hotham* v. *East India Company,* 1 Term R., 645; *Keaine* v. *Catara,* 2 Gallis R., 61; *Horill* v. *Stephenson,* 4

Carr and Payne, 469, 605; *Borden* v. *Borden*, 5 Mass. R., 67 · *Bradstreet* v. *Baldwin*, 11 Mass. R., 229; *Frazier* v. *Cushman*, 12 Mass. R., 279; *Thurston* v. *Foster*, 2 Fairf. R., 74; *Beecher* v. *Becktel*, above cited.

5. It was the defendant's duty to have offered, if the vessel could not have taken the spars for which he had an order, such of the spars as she would have taken without enlarging her port-holes, and have completed her cargo with " other materials," mentioned in the charter, or else have furnished her with a full cargo of " other materials."

The reason why he did not do so, is apparent from the fact in testimony, that freights had declined after the date of the charter, and that when the Susan Husten was lying in Bangor, many vessels were lying idle there.

*As to damages.* In *Keaine* v. *Catara*, 2 Gallis R., 61, the rule of damages is declared to be, in such a case as this, the whole sum named in the charter. It is admitted that the rule is not uniform. If the court should not sustain the view of the law, as decided in the case referred to, it is respectfully submitted, that as reasonable, immediate, and natural damage to the plaintiffs, flowing from the act of the defendant, they are entitled to recover a fair compensation for the vessel while she was detained in Bangor, waiting for the cargo. This time appears to have been three days, which, at the rate Mr. Vickery testifies to, would amount to sixty dollars, and according to Mr. Barnard's calculation, to fifty dollars.

Also the time which the vessel was going from Bangor to Calais, it being a fair inference from the testimony, that no freight could be procured for her in Bangor, at the time she was there, in so short a time as one could be obtained in Calais, where her owners lived, which time a jury, from their knowledge of distances, of winds, and of the sailing of vessels, might reasonably infer, would be about five days, which, at the rates in testimony, would amount to eighty-three or one hundred dollars.

Also the difference between a lumber freight at that time,

of which she would carry 100,000 feet, at three dollars a thousand, making $300, and the sum named in the charter, $400, which difference would be $100. In all making a sum of $233 to $260, which would be very much less than the damage actually sustained.

*Rowe & Bartlett*, counsel for the defendant.

The plaintiffs were common carriers, engaged to carry a cargo of spars in their schooner for the defendant from Bangor to Philadelphia. The defendant engaged to furnish a cargo of spars or other materials to be so carried. He accordingly procured a cargo, and requested the plaintiffs to carry it. The plaintiffs refused to carry it because it was inconvenient to load. Which party has violated the contract?

The spars were twenty to twenty-four inches at the butt; the port of the schooner was of capacity to receive spars only eleven and one quarter inches at the butt; but she was suitable for carrying spars of twenty-four inches.

She was to carry spars from the port of Bangor. The usual sizes of spars in the Bangor market are from ten to twenty-four inches. The defendant was at liberty to furnish any cargo he pleased. The plaintiffs specially contracted to carry spars. There were no restrictions in the contract as to the size of the spars. The law implies none, except this, that they shall be such as the schooner was suitable to carry. Having engaged to carry spars from Bangor, without restriction as to size, the plaintiffs were bound to carry such as are usually shipped from that port, if his vessel were suitable to carry them.

It is the duty of the freighter to deliver the cargo along side, and the duty of the ship owner to take it on board and stow it. 3 Kent's Com., p. 209, 5th edition. The ship owners are bound to find ways and means of taking the cargo on board. "The ship must be fit and competent for the sort of cargo, and the particular service for which she is engaged." Abbott on Shipping, 5th Am. edition, pp. 417–18–19, and note 2. If her hatches are not large enough to receive her

cargo, they must be enlarged. If a vessel engaged to take a cargo of cotton in bales, or sugar in casks, from a particular port, her hatches must be, if necessary, made of a size sufficient to receive casks or bales of the dimensions usually shipped at that port. The same rule must hold in regard to shipping lumber.

There is no evidence that the defendant or his agent examined the port-holes at Philadelphia, or had an opportunity to do so. The defendant was not on board; his agent was; but at the time the forward part of the vessel was three quarters full of corn, so there was no opportunity of examining. His attention seems not to have been called to the size of her ports, or even the fact that she had any port. The plaintiffs knew the size of the ports. The captain, part owner as well as agent, was bound to know the fact, and his first officer also knew it, if his declaration to Atwood is to be believed; but neither of them called the attention of the defendant's agent to the fact, nor was any restriction, as to the size of the spars to be furnished, made part of the contract. Suppose the schooner had had no port, would the owners have been excused from carrying spars at all, and would the defendant have been bound to furnish a cargo of other materials? It is no uncommon thing, we believe, for ships intended for general trade, to be chartered for carrying long lumber or timber, and in such cases the owners always, as a matter of course, cut the port holes.

The plaintiffs' counsel relies upon a decision of Judge NELSON, in *Beecher* v. *Becktel,* reported in the New York Tribune of September, 1853; that is but a newspaper report, and if correct, can have no weight as authority, for it discloses the very significant fact that Judge NELSON was merely reversing the decision in the same case, of Judge BETTS, of the Southern District of New York, whose experience as an admiralty lawyer is greater, and his reputation as high as Judge NELSON'S. The report, then, merely shows that two very respectable judges have come to conclusions diametri-

cally opposite, on the questions in that case. Had Judge NELSON had more acquaintance with the vessels constructed for the lumber trade, he would not have talked as he is reported to have done about the expense of the alteration, or the danger of thereby rendering the vessel unseaworthy.

Whatever might have been the facts in that case, there is no evidence here that the alteration would have been seriously expensive, or would in any way have injured the vessel.

We submit, then, that the case shows that the defendant did furnish a cargo of spars, within the meaning of the contract, such as the plaintiff's were bound to take. The insinuation of the counsel that he wished to get rid of his contract, is not supported, but is contradicted by the testimony; for Atwood testifies that he had procured the cargo to ship.

The claim for damages here seems to us a little singular, when the plaintiffs had engaged to carry a cargo of spars from Bangor to Philadelphia, without any restriction as to size, and had refused, when spars of no unusual size were tendered, to take any but those of the smallest size to be found in the Bangor market, and such as are rarely shipped from that port to Philadelphia, and such as the plaintiffs had not to send.

*Dyer*, in reply:

The argument of the defendant seems to be based upon a misapprehension of the testimony. It is proposed to examine these errors in reading and in argument in their order.

The contract is not stated correctly. The plaintiffs let their vessel "for a voyage from Bangor or Mill Creek to Philadelphia," and the defendant agreed "to furnish a cargo of spars or other materials," for her to carry.

The plaintiffs *never* "refused to carry it, (the cargo of spars,) because it was inconvenient to load." The captain and the mate in charge "were ready to take in any cargo they could put on board, without cutting the vessel up;"

were ready and willing to receive such spars as he could take without enlargement of the ports of the vessel."

The law in Kent is cited correctly. "It is the duty of the freighter to deliver the cargo alongside, and the duty of the ship owners to take it on board and stow it."

The delivery alongside is prerequisite to the taking on board. There is no evidence, and there is no pretense, that the defendant ever delivered a particle of cargo alongside, or had any near the vessel; or that the plaintiffs, or either of them, or the mate in charge, ever saw one of the spars which the defendant said that he had.

By the rule of law cited by the defendant's counsel, the defendant having in no wise performed his part of the contract, which was to furnish, and, by intendment of law, to deliver the cargo alongside, was the first and the only one of the parties to break it. Moreover there is no evidence, and no pretense, that the defendant ever tendered any cargo, or *offered* any cargo for the vessel.

There is no evidence, as stated by the defendant's counsel, that the vessel's ports were of the "capacity to receive spars only eleven and one quarter inches at the butt." Evans says that he did not know how large the port-holes were. He repeats conversations tending to show that the captain understood that Richards would *furnish* no spars over eleven and one quarter inches; says that the mate told him that the captain said that the understanding was, that there should be no spars taken over eleven inches at the butt end. No one of the witnesses testifies about the size of the port-holes except Vickery. He knew the schooner well, and had owned and run vessels for twenty years. The ports were sixteen to eighteen inches—quite large enough to take in the spars ordinarily shipped from Bangor, which were from ten to eighteen inches.

Vickery's statement is misquoted by the defendant's counsel, by leaving off the controlling portion of it. He testified that "she was suitable to carry spars two feet at the butt,"

"*or anything else that could be put into the hold, or carried on deck.*"

The ordinary sized spars in Bangor, were from ten to eighteen inches; they "*run* from ten to twenty-four inches," which is the whole range of their sizes, and not the "usual" sizes.

It is not a correct statement that "the defendant was at liberty to furnish *any* cargo he pleased," nor the subsequent proposition, by way of qualification, "such as the schooner was suitable to carry." It is apparent that the schooner would not be bound by the contract to carry, for instance, any cargo which should greatly endanger her safety, or work injury to her, or, as in this case, any cargo which could not be carried without destroying the integrity of the vessel.

"The plaintiffs did not specially contract to carry spars." They furnished the vessel, and did no more.

It is true that there was "no restriction in the written contract as to the size of the spars," but it is in evidence that it was "the understanding that there should be no spars taken over eleven inches at the butt end." The mate told the defendant, "they were to take spars not over eleven and one quarter inches in diameter at the butt."

This evidence being in no way contradictory of the written contract, was unobjectionable, and even if objectionable, was not objected to at the time of trial, qualifies the writing to the same extent as if it had been incorporated in it.

The citation from note 2, p. 417, of Abbott, means simply that the ship shall be sufficient for the voyage, in point of sea-worthiness—tight, strong, well equipped and manned. It has no such meaning as that indicated in the defendant's argument.

And in the same connection, the rules, given as law, in the defendant's argument, are not supported by any authority, and are believed to be unsound and incorrect in reason.

The true rule is believed to be that declared in the plaintiff's opening argument, and sustained by authorities, viz.: that if A agrees to carry a particular cargo absolutely, he

must furnish a vessel which will carry it; but if A agrees to furnish a vessel, and B, knowing the vessel or seeing the vessel, or having the opportunity of doing so, agrees to furnish a cargo for her, then B must furnish such a cargo as the vessel will carry without alteration.

This seems too plain to require argument, for if one alteration in a vessel may be insisted upon, so may another, to the utter destruction of the vessel.

The statement of the defendant's counsel in argument, that " there is no evidence that the defendant or his agent examined the port-holes in Philadelphia, or had an opportunity to do so," is an error. " The man who chartered her in Philadelphia, came on board of her, went below and examined her." " The man who came on board of the vessel, to charter her in Philadelphia, went clear into her hold and examined the vessel." " The forward part of the vessel was nearly three quarters full" of corn. The ports of a small vessel are high up, nearly to the beams, and would be in plain sight, and "the hatches were off. The charterer was on board twice ;" " examined the schooner." " I think Richards was in Philadelphia at the date of it," ( the charter.)

" I do not know whether the defendant or his agent was on board of the vessel in Philadelphia, but either one or the' other of them was, certainly, and perhaps both of them, and really made an examination of her ports, as well as had abundant opportunity to do so."

As to the custom of cutting port-holes in ships intended for general trade, when chartered for carrying timber or long lumber, and the fact of its being a general practice, there is no evidence.

I have seen many ships loaded with deals for England, every year for several years, and I know that the cutting of port-holes is the rarest of occurrences, very expensive, and always reckoned as impairing the strength of the ship. I venture to say, that the hatches of any ship, unless very old, were *never* enlarged to take in cargo.

As to the enlargement of port-holes in schooners, coasters,

the evidence of Barnard is, that it is very uncommon, and of Vickery, that he never knew it to be done. It is well known in this state, where almost every man is in some sort familiar with the construction of vessels, that to enlarge the ports of a coaster from sixteen to eighteen inches, to such a size as would enable the vessel to receive spars two feet in diameter, would require the taking out of a heart hook, and the putting in of a new one, a labor of some duration, expensive, and weakening and damaging to the vessel.

All that is asked with regard to the case of *Beecher* v. *Becktel*, is a fair examination of the reasons which led Judge NELSON to his determination, and these reasons are believed to be in conformity to the principles of law, as settled in other cases.

It is apparent that the defendant wished to avoid his contract, by his whole course of conduct, and it is clear, that although he had a cargo of spars, he could have found a vessel in Bangor, when the Susan Husten arrived there, which would have carried his cargo for a less sum than that named in the contract.

" Freights from Bangor had declined from the date of the charter." There is reason to believe, that the defendant was " bluffing off" the captain from the contract, when he told him that the spars were from twenty to twenty-four inches in diameter. It is hard to believe, that the defendant was prepared to ship a cargo of spars, all of such unusual size. If he had had in reality such a cargo, and the port-holes of the vessel had been of a size to receive it, the plaintiffs would have been under no obligation to receive them. By a contract to ship spars simply, the defendant bound himself to ship those of ordinary or usual sizes, and would have had no right to have selected the very largest. The court may readily conceive, that a cargo of spars may be taken in and on board of a vessel, with considerable ease, as in practice they always are, by taking the smaller ones into the ports, and the few larger ones on deck, and any usual cargo which

the defendant honestly meant to ship by the Husten, would have been taken by her. But it is a very different affair, to attempt to take spars of two feet in diameter, and proportionably long, over sixty feet, into the hold of a small vessel, where the size and weight of the stick, and the limited space to work in, would make loading such a cargo dangerous, expensive, and tedious. It is seriously doubted, if a spar of two feet in diameter, and of proportionate length, was *ever* put into the port-holes of a coaster in Bangor.

But it sufficiently appears, in this case, that the contract on the part of the defendant or his agent, was by parol so qualified and restrained, that the defendant was to ship spars not over a certain size. There is nothing in the case to the contrary.

It was then the duty of the defendant to have furnished spars of this limited size, and the plaintiffs were under no obligation to carry others.

RICE, J. This is an action of assumpsit, for an alleged breach of a contract, of which the following is the substantive part, to wit: "The party of the first part agrees to the chartering of the whole of the said schooner, (the Susan,) under and over deck, for a voyage from Bangor or Mill Creek, to Philadelphia, and the party of the second part agrees to furnish to the said schooner a cargo of spars or other materials, and pay for the use of the vessel four hundred dollars upon delivery of cargo in Philadelphia."

This agreement was entered into in Philadelphia, April 15, 1853, the schooner then being at that port. On receiving notice that the schooner had arrived at Bangor, and was in readiness to receive her cargo under the contract, the defendant offered to furnish a cargo of spars, but which were so large that they could not be taken into the hold of the schooner without enlarging her port-holes. This, the master declined to do, and the defendant refused to furnish other freight. After waiting three days at Bangor for a cargo,

and none being offered by the defendant except the spars aforesaid, the schooner sailed for Calais, Maine, and the owners bring this action.

Whether the action can be maintained depends upon the construction of the contract, which is a mere memorandum, inartificially drawn, and entirely destitute of those specific details which are usually inserted in charter-parties, by which the rights and duties of the respective parties are defined. If the memorandum is to be treated as a contract of affreightment, in which the plaintiffs agree to take a cargo of spars for the defendant from Bangor or Mill Creek to Philadelphia, at a price agreed, then it was the duty of the plaintiffs to furnish a ship tight and staunch, and strong, well furnished in all respects, victualled and manned, and of suitable capacity to receive and transport such spars as are ordinarily shipped from those ports to Philadelphia, and a failure to furnish such a vessel would be a breach of contract on the part of the owners. 3 Kent's Com., 204. If on the other hand the contract was a hiring of the vessel by the defendant for the voyage, with a knowledge of her capacity, for the purpose of transporting or having transported in her a cargo of spars or other materials, then it was the duty of the defendant, on her rendition to him at Bangor or Mill Creek, in a proper condition to perform her voyage, to furnish her, without delay, a cargo of spars or other materials suitable to her capacity, as she was at the time of hiring, and the owners were under no obligation to remodel the schooner or in any way to change her construction.

As we have already remarked, the contract is entirely wanting in details. Its construction, however, considered in connection with the situation of the parties, is not difficult. The defendant, by himself and agent, had been on board the schooner, and had a full opportunity to examine her and ascertain her capacity before the agreement was executed. There is no suggestion of fraud or concealment on the part of the owners. No latent defects have been discovered. Under these circumstances the owners " agree to the char-

tering of the whole of said schooner, under and over deck, for a voyage from Bangor or Mill Creek to Philadelphia," and the defendant "agrees to furnish the said schooner a cargo of *spars* or *other materials*, and pay for *the use of the vessel* four hundred dollars upon delivery of cargo in Philadelphia."

Here, it will be observed, was a chartering of the whole vessel, under and over deck, on the one part, and on the other part an agreement to pay a given sum for the *use of the vessel*. There is no stipulation for carrying freight of any kind on the part of the owners, and no agreement to pay *freight*, on the part of the defendant. He simply agrees to pay four hundred dollars for the use of the vessel, and to furnish her with a cargo of spars or other materials. It does not even appear by whom she was to be sailed.

In view of these considerations we cannot doubt that the agreement is to be treated as a contract of hiring rather than of affreightment; a contract of hiring, in which the hirer knew the character and capacity of the schooner before he entered into the contract. He then took her as she was, so far as her general capacity and construction was concerned. All that the owners could be held to guaranty was, that she was sea-worthy. The defendant was entitled to load her, but he must load her with a cargo, whether it was of spars or other materials, suitable to her capacity. The case of *Beecher and al.* v. *Becktel*, decided by NELSON, J., in the Admiralty Court of New York, cited from the New York Tribune, September 24, 1853, is in point, and is sustained by sound reasoning.

The plaintiffs, therefore, are entitled to maintain their action, and the only question is as to the amount they are entitled to recover. Under their contract they would have been entitled to the round sum of four hundred dollars on delivering their cargo in Philadelphia. It was in evidence that the schooner would carry about 100,000 feet of lumber; that the freight on lumber from Bangor to Philadelphia, at that time, was three dollars per thousand. It does not appear that the owners might not have obtained a freight of

lumber, if they had desired to do so. Had they so done, the difference between such freight and the contract price for the use of the vessel for the voyage would have been one hundred dollars, which sum they must be deemed to have lost by the failure of the defendant to comply with his contract. In addition to this, the schooner remained at Bangor waiting for freight three days. The evidence shows that her time for those three days was worth from fifty to sixty dollars. We adopt the medium, fifty-five dollars. It was the duty of the plaintiffs, immediately after the breach of the contract on the part of the defendant, to seek other employment, so that no unnecessary loss should be sustained. Such seems to have been the course adopted by them, and there is no evidence of any greater loss having been sustained than the items referred to above.

A default is therefore to be entered, and judgment for one hundred and fifty-five dollars damages, with interest from the date of the writ, and costs.